## MONTEREY MECHANICAL CO., Plaintiff–Appellant,

v.

Pete WILSON; Gray Davis; Curt Pringle; Delaine Easton; Barry Munitz; Roland E. Arnall; Marian Bagdasarian; William D. Campbell; Ronald L. Cedillos; Jim Considine; Martha C. Fallgatter; Bernard Goldstein, Jr.; James H. Gray; William Hauck; Joan Otomo–Corgel, Dr.; Ralph R. Pesqueira; Ali C. Razi; Ted J. Saenger; Michael D. Stennis; Anthony M. Vitti; Stanley T. Wang; Frank Y. Wada, Individually and as Trustee of the California State University; Swinerton and Walberg Co., a California Corporation, Defendants–Appellees.

### No. 96–16729.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 10, 1997.

Decided Sept. 3, 1997.

Marcia L. Augsburger, McDonough, Holland & Allen, Sacramento, CA, for plaintiffs-appellants.

Karen L. Robinson, California State University, Legal Division, Long Beach, CA, for defendants-appellees.

Dana M. Rudnick and Barbara Gadbois Gibbs, Giden, Locher & Acret, Los Angeles, CA, for defendants-appellees.

Anthony T. Caso, Pacific Legal Foundation, Sacramento, CA, for defendant-appellee.

Before: O'SCANNLAIN, LEAVY and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

We review denial of a preliminary injunction, regarding a state program setting goals for ethnic and sex characteristics of construction subcontractors.

## FACTS

California Polytechnic State University, San Luis Obispo (the University) solicited bids for a utilities upgrade. This construction project, expected to take almost two years, will connect all buildings to a central heating and air conditioning plant and install a new electrical distribution system. Monterey Mechanical, the plaintiff-appellant, submitted the low bid, $21,698,000.00, but did not get the job. The second lowest bidder, Swinerton and Walberg, won the contract, with a bid $318,000 higher than Monterey Mechanical's.

Monterey Mechanical's bid was disqualified because the company did not comply with a state statute. The statute requires general contractors to subcontract percentages of the work to minority, women, and disabled veteran owned subcontractors, or demonstrate good faith efforts to do so. The required "goals" are "not less than" 15% for minority business enterprises, 5% women, 3% disabled veteran. Cal. Public Contract Code § 10115(c). To count towards fulfilling the goal, a subcontractor must be at least 51% owned and controlled by members of those classes. Cal. Public Contract Code § 10115.1(e).

There were two ways Monterey Mechanical might have complied with the statute. It could have used minority, women and disabled veteran business enterprises for the designated 23% (15% plus 5% plus 3%) "of the contract dollar amount." Its bid was $21,698,000, so compliance by this means would require subcontracting $4,990,540 to subcontractors of the designated classes.

Alternatively, Monterey Mechanical could comply by demonstrating "good faith effort" to meet the "goals." The statute requires a bidder using "good faith" as its means of qualifying to contact government agencies and organizations to identify potential subcontractors in the designated classes, adver-

tise in papers "focusing on M/W/DVBEs," [1] and solicit bids from "potential M/W/DVBE subcontractors and suppliers." The contractor must document its efforts within two days following the opening of the bids, so as a practical matter the solicitation must be fully accomplished prior to bidding. Dates, times, organizations contacted, contact names, and phone numbers are "needed to corroborate the information."

Monterey Mechanical did not fully comply with the statute by either method. Its President acknowledges that "Monterey is not eligible for classification as an MBE or a WBE." It did not subcontract out the required 23% of the contract amount.[2] Nor did Monterey Mechanical fully comply with the "good faith" requirement. Monterey Mechanical contacted state and federal agencies and minority and women organizations, advertised to minority and women owned firms, and invited and considered bids from them. But it did not document contact with the University physical planning and development office to identify minority, women, and disabled veteran business enterprises.

Swinerton and Walberg, which won the contract, did not subcontract out at least 23% of the work to firms in the designated classes (and does not claim to be a minority, women, or disabled veteran enterprise). It differed materially from Monterey Mechanical only in that it fully complied with the "good faith" requirement. Unlike Monterey Mechanical, it provided documentation of its contact with the University physical planning and development office to identify minority, women, and disabled veteran business enterprises.

When the University rejected Monterey Mechanical's bid as non-responsive, Monterey Mechanical requested whatever disparity study California State University had used to justify the goals for the designated classes. The University replied that there was no such study. It took the position that because

1. "M/W/DVBEs" is the designation on the University's forms for "Minority/Woman/Disabled Veteran Business Enterprises."

2. Monterey Mechanical put in 13 times as much money for black subcontractors as Swinerton and Walberg, and a slightly higher amount for women subcontractors, though the total percent-

ages were not very high for either of them. Neither company proposed to subcontract anything to disabled veteran subcontractors. Swinerton and Walberg had a higher total for total minority participation because of a $3,000,000 item for "Pacific Asian" minority participation.

the "goal requirements" of the scheme "do not involve racial or gender quotas, set-asides or preferences," the University needed no such disparity documentation.

Monterey Mechanical protested the contract award, then sued the University's trustees and Swinerton and Walberg for a declaratory judgment, injunction, and damages. The theory of the lawsuit is that the statute that caused Monterey Mechanical to lose the contract violates the Equal Protection Clause of the United States Constitution.

The district judge denied the preliminary injunction. Monterey Mechanical has appealed. The denial was based on a legal conclusion that Monterey Mechanical had a low probability of success on the merits.[3] No findings of fact were made, nor were any necessary, because there was no dispute as to any of the facts. The facts recited above, from the documents submitted by the parties, are uncontested.

## ANALYSIS

■ We have jurisdiction to review "[i]nterlocutory orders … refusing … injunctions" under 28 U.S.C. § 1292(a)(1). While we review its decision not to enter a preliminary injunction for an abuse of discretion, the district court is deemed to abuse its discretion when it "bases its decision on an erroneous legal standard." *American–Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045, 1062 (9th Cir.1995). Thus an abuse of discretion is established if the district court applied the incorrect substantive law. *International Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir.1986).[4]

---

**3.** Here is the relevant portion of the district court decision:

The motion for preliminary injunction will be denied. I find that plaintiff has little likelihood of success on the merits on the equal protection claim as pled. The Fourteenth Amendment's equal protection clause requires the State to justify the differential treatment of similarly situated individuals.

. . . . .

On its motion plaintiff argues that California has not made sufficient findings of past discrimination to support Minority Women Enterprise participation goal requirements. In so arguing plaintiff immediately focuses on strict scrutiny analysis without considering what I believe a necessary first step.

By that I mean that plaintiff apparently assume without analysis that California's Minority and Women Enterprise participation goals treat general contractors differently on the basis of race and gender. I'm not satisfied that this is the case. In fact, it's plain that the participation goals require all general contractors, regardless of race or gender, to either submit bids with a set percentage of Minority Women Enterprise participation or to actively seek out and solicit bids from Minority Women Enterprise subcontractors.

Thus the statute does not appear to treat general contractors differently. It might be argued that the statute does treat non-minority women enterprise general contractors differently in one respect. A minority business enterprises that will perform 15% of the contract with its own labor and equipment is under no obligation to seek out minority business enterprises subcontractors since it already meets the minority business participation goal.

The same is true of women business enterprises general contractors who intend to perform five percent of the contract themselves. However, this possible difference in treatment appears to me to be de minimis. In fact, the extra step of soliciting bids from minority business enterprises where a minority business enterprise general contractor might not have to seems hardly worth mentioning.

This is especially so, given that the minority business enterprise would still be required to solicit bids from women business enterprises, nor is there any showing that this possible extra step which might have to be performed by non-minority women enterprises makes it more likely that a minority women business enterprise will be awarded a contract over a non-minority women business enterprise. More importantly, however, even if it is conceded that this possible difference in treatment among general contractors is sufficient to confer standing upon plaintiff to challenge the constitutionality of California's minority women business enterprise participation goal requirements, that possible difference in treatment would not entitle plaintiff to the relief he seeks here.

. . . . .

The record shows that the state let the contract to a non-minority women business enterprise general contractor who solicited bids from minority women business enterprise contractors, but did not meet the participation goals. Accordingly, there is no causal relationship between the manner in which the statute might treat general contractors differently and plaintiff's failure to win the contract. Here in fact, the statute treated plaintiff and defendant Swinerton exactly the same.

**4.** California's Proposition 209, *see Coalition for Economic Equity v. Wilson*, 110 F.3d 1431, 1997

## A. Standing.

■ The district court concluded that Monterey Mechanical lacked standing. Because Swinerton and Walberg was not a women or minority business enterprise,[5] and all general contractors, not just non-minority non-women contractors, were bound by the same requirements, the district court concluded that unconstitutional discrimination, even if it existed, did not cause Monterey Mechanical to lose the contract. The idea is that if the government does not discriminate against A, but requires that A discriminate against B, B has standing but A does not. Appellees[6] do not argue that Monterey Mechanical lacked standing. We nevertheless consider standing sua sponte, because it goes to jurisdiction. "Standing is a question of law reviewed de novo." *Snake River Farmers' Assn. v. Department of Labor,* 9 F.3d 792, 795 (9th Cir.1993).

The issue of standing is controlled by *Northeastern Florida Contractors v. Jacksonville,* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). That was another contracting set-aside case. The plaintiff made no showing that it or any of its members would have received particular contracts but for the challenged set-aside ordinance. The Court held that to establish standing in challenges to set-aside laws, a bidder need only demonstrate that a discriminatory policy prevents it from competing on an equal footing, not that the discrimination caused its failure to win a contract: .

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.... And in the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract.... To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.[5]

---

[5] It follows from our definition of "injury in fact" that petitioner has sufficiently alleged both that the city's ordinance is the "cause" of its injury and that a judicial decree directing the city to discontinue its program would "redress" the injury.

*Id.* at 666, 113 S.Ct. at 2303.

Monterey Mechanical was prevented by the statute from competing on an equal footing with general contractors in the designated classes. Had it been a minority or women business enterprise (or both), and proposed to keep those classes' work rather than subcontract it out, it would have been excused to that extent from both the subcontracting and "good faith" requirements. *See* Cal. Public Contract Code §§ 10115(c), 10115.2.

---

WL 160667 (9th Cir. April 8, 1997), was passed after Monterey Mechanical was disqualified and the contract was awarded to Swinerton and Walberg, and after the district court denied Monterey Mechanical a preliminary injunction. The parties have not argued that the subsequent change in state law affects this case. They have not made any arguments regarding Proposition 209. We therefore do not consider what effect if any Proposition 209 or *Coalition for Economic Equity* might have on this case.

**5.** None of the parties have presented any arguments regarding the statutory provision relating to disabled veterans, Cal. Public Contract Code § 10115 et. seq., so we disregard it in our discussion. Monterey Mechanical does not challenge its constitutionality, and the University does not make any arguments relating to it. Accordingly, we do not consider the disabled veterans provisions of the statute, and our decision has no bearing on the provisions of the statute regarding disabled veterans.

**6.** Governor Pete Wilson was nominally a defendant in the case, and as such prevailed in district court. He has accordingly filed an appellee's brief rather than an appellant's brief. But his position is the same as appellant's, that the statute is unconstitutional. Though nominally an appellee, Governor Wilson is in substance an appellant. Our references to appellees arguments do not include the arguments made by Governor Wilson.

We construed *Northeastern Florida Contractors* in *Bras v. California Public Utilities Commission*, 59 F.3d 869 (9th Cir.1995). We held that in a challenge to an affirmative action program, "plaintiffs did not have to prove that they would lose any bids or identifiable contracts in order to sustain actual injury." *Id.* at 873. "An injury results not only when [the bidder] actually loses a bid, but every time the company simply places a bid." *Id.* at 873, quoting *Coral Construction Company v. King County*, 941 F.2d 910 (9th Cir.1991). Our analysis of standing in *Coral Construction* was approved of by the Court in *Northeastern Florida Contractors*, 508 U.S. at 660, 113 S.Ct. at 2300. A bidder need not establish that the discriminatory policy caused it to lose the contract. To establish standing bidders "need only show that they are forced to compete on an unequal basis." *Bras*, 59 F.3d at 873. Being forced to compete on an unequal basis because of race (or sex) is an injury under the Equal Protection Clause. *See Northeastern Florida Contractors*, 508 U.S. at 665–67, 113 S.Ct. at 2303.

The Tenth Circuit applied *Northeastern Florida Contractors* to standing under an ordinance substantially similar to the statute before us in *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513 (10th Cir.1994). *Concrete Works* held that because minority and women business enterprises could use their own work to satisfy goals for their classes while firms not in these classes would have to subcontract the work out or show "good faith," a non-minority and non-women bidder satisfied all elements of the standing requirement. The injury in fact was that "the extra requirements imposed costs and burdens on non-minority firms that preclude them from competing with MBEs and WBEs on an equal basis." *Id.* at 1518, 1519. The case at bar is indistinguishable from *Concrete Works*, and there is no justification for creating an intercircuit split of authority on this point.

Monterey Mechanical established injury in fact traceable to the challenged statute, and established redressability, for several reasons. One is that a minority-owned or women-owned bidder could keep the work for its class (and a firm owned and controlled by women who were minorities could keep the work for both classes). Keeping the work would avoid the loss of profits to subcontractors, and the time and expense of complying with the "good faith" requirements. Though Swinerton and Walberg subsequently won the contract, Monterey Mechanical did not know that when it submitted its bid. The time of bidding was the relevant time for determining whether Monterey Mechanical was unable "to compete on an equal footing in the bidding process." *Northeastern Florida Contractors*, 508 U.S. at 666, 113 S.Ct. at 2303. When it prepared and submitted its bid, Monterey Mechanical had to do so in the face of a statute conferring advantages on whatever competing bidders might be in groups identified by ethnicity and sex. The burden of bidding in a discriminatory context established by statute is, under *Northeastern Florida Contractors*, injury in fact caused by the challenged statute.

■ Standing is also established in this case independently of whether minority or female competitors, if there were any, would have competed against Monterey Mechanical on a privileged basis. Standing doctrine "requires us to ask . . . 'Was this person hurt by the claimed wrongs?'" *Snake River Farmers' Assn. v. Department of Labor*, 9 F.3d 792, 798 (9th Cir.1993). Even if a general contractor suffers no discrimination itself, it is hurt by a law requiring it to discriminate, or try to discriminate, against others on the basis of their ethnicity or sex. A person required by the government to discriminate by ethnicity or sex against others has standing to challenge the validity of the requirement, even though the government does not discriminate against him.

A person suffers injury in fact if the government requires or encourages as a condition of granting him a benefit that he discriminate against others based on their race or sex. Americans view ethnic or sex discrimination as "odious," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 214, 115 S.Ct. 2097, 2106, 132 L.Ed.2d 158 (1995). The principle that ethnic discrimination is wrong is what makes discrimination against groups of which we are not members wrong, and by that principle, discrimination is wrong

even if the beneficiaries are members of groups whose fortunes we would like to advance. The person required by government to engage in discrimination suffers injury in fact, albeit of a different kind, as does the person suffering the discrimination. A "law compelling persons to discriminate against other persons because of race" is a "palpable violation of the Fourteenth Amendment," regardless of whether the persons required to discriminate would have acted the same way regardless of the law. *Peterson v. City of Greenville*, 373 U.S. 244, 248, 83 S.Ct. 1119, 1121, 10 L.Ed.2d 323 (1963).

The contractor required to discriminate also suffers injury in fact because the statute exposes him to risk of liability for the discrimination. A private actor may be subject to section 1983 liability for discriminating against persons based on their ethnicity or sex pursuant to a state law requiring it. *Adickes v. S.H. Kress and Company*, 398 U.S. 144, 148, 152, 90 S.Ct. 1598, 1603, 26 L.Ed.2d 142 (1970). For example, the plaintiff in *Bras v. California Public Utilities Commission*, 59 F.3d 869 (9th Cir.1995), brought a section 1983 claim for damages against Pacific Bell for discriminating against the plaintiff in the course of complying with a state statutory scheme to increase minority and women owned businesses shares of utility contracting.

The contractor required to discriminate also suffers injury in fact because of the increased expense and difficulty of performing the contract. A construction contract is not completed when the winning bid is announced. The work must be done. A general contractor often uses the same specialty subcontractors on many jobs, because of successful past experience with them, so it would be a waste of time and money to solicit bids from strangers, and risky to accept them. The statute allows a women- and minority-owned contractor to subcontract out a fifth of the work to whomever it chooses, or keep the work itself, but denies this flexibility to contractors not in those groups.

Appellees have not argued absence of redressability. But for the minority and women enterprise goals and "good faith" requirements, Monterey Mechanical would have won the contract. The statute imposed injury in fact on Monterey Mechanical. Monterey Mechanical has standing to challenge the statute pursuant to which its bid was rejected.

**B. Classification.**

■ Appellees argue that Monterey Mechanical's equal protection challenge has to fail, because the statute treats all general contractors bidding on state jobs alike. They argue that because general contractors are treated alike, there is no unequal treatment to which any scrutiny need be applied, that is, no classification. There are two aspects to this argument. One is that all general contractors are treated alike. To the extent that minority or women contractors could avoid the subcontracting and good faith requirements for their groups, the argument goes, the difference is de minimis. The second is that the scheme has enough flexibility, because a contractor can avoid the percentages by "good faith" efforts, so that its ethnicity and sex aspects cannot violate the Equal Protection Clause. The district court adopted the first of these arguments. Appellees' argument that the statute does not classify general contractors by ethnicity or sex is in some respects the standing argument in a slightly different form. Because it is made separately, and addresses the Equal Protection Clause rather than the case or controversy requirement in Article III, we discuss classification independently of standing.

**1. Different treatment.**

The argument that all general contractors are treated alike, regardless of sex or ethnicity, is mistaken. They are not. The statute requires that state contracts have "participation goals" of at least 15% minority, 5% women, and 3% disabled veteran enterprises:

> [C]ontracts awarded by any state agency, department, officer, or other state governmental entity for construction, professional services ..., materials, supplies, equipment, alteration, repair, or improvement shall have statewide participation goals of not less than 15 percent for minority business enterprises, not less than 5 percent for women business enterprises and 3 per-

cent for disabled veteran business enterprises. These goals apply to the overall dollar amount expended each year by the awarding department....

Cal. Public Contract Code § 10115(c). A state agency making a contract award is required to award the contract to the low bidder "meeting or making good faith efforts to meet these goals":

(a) In awarding contracts to the lowest responsible bidder, the awarding department shall consider the efforts of a bidder to meet minority business enterprise, women business enterprise, and disabled veteran business enterprise goals set forth in this article. The awarding department shall award the contract to the lowest responsible bidder meeting or making good faith efforts to meet these goals.

(b) A bidder shall be deemed to have made good faith efforts upon submittal, within time limits specified by the awarding department, of documentary evidence that all of the following actions were taken:

(1) Contact was made with the awarding department to identify minority, women, and disabled veteran business enterprises.

(2) Contact was made with other state and federal agencies, and with local minority, women, and disabled veteran business enterprise organizations to identify minority, women, and disabled veteran business enterprises.

(3) Advertising was published in trade papers and papers focusing on minority, women, and disabled veteran business enterprises, unless time limits imposed by the awarding department do not permit that advertising.

(4) Invitations to bid were submitted to potential minority, women, and disabled veteran business enterprise contractors.

(5) Available minority, women, and disabled veteran business enterprises were considered.

Cal. Public Contract Code § 10115.2(a).

The statute allows a minority or women business enterprise to satisfy the goals by allocating the percentage of work for its group to itself. The statute requires the state to award the contract to the "bidder meeting ... the goals," Cal. Public Contract Code § 10115.2(a). It does not say that the "bidder" should meet the goals by subcontracting the work to someone else instead of keeping it for itself. It would be nonsensical to disqualify, for example, a minority enterprise's bid for not meeting the 15% minority goal, when the minority bidder proposed to do at least 15% of the work itself. The university bid documents accordingly say that one way to meet the goals is that, "[t]he bidder is an MBE and committed to performing not less that 15% of the contract dollar amount *with its own forces* or in combination with those of other MBEs and is committed to using WBEs for not less than five (5) percent of the contract dollar amount, and DVBEs for not less than three (3) percent of the contract dollar amount." Supplementary General Conditions § 1(b) (emphasis added). Likewise for women and disabled veteran bidders.

Under these provisions, a bidder not in any of the designated groups must subcontract out at least 23% of the job, or make good faith efforts to do so, to subcontractors in the designated groups. But a minority or female bidder can avoid that requirement by keeping that group's work for itself. Thus not all general contractors bidding on state projects are treated the same way. An enterprise in all the designated categories can, by keeping at least 23% of the work for itself, avoid any of the requirements of the statute.

The district court considered this difference, but concluded that it was *de minimis*. *De minimis non curat lex* means that the law does not concern itself with trifles. *Black's Law Dictionary* 482 (4th ed.1957); *Ballentine's Law Dict.* 330 (3d ed.1969). On this $21,698,000 job, it would be worth $3,254,700 of the gross to be a minority as compared with a non-minority bidder, if the bidder were to keep as much as possible of the work for itself. A bidder in all three categories could keep $4,990,540 that a bidder in none would have to subcontract out or demonstrate a good faith effort to do so. There is nothing *de minimis* about that kind of money.

### 2. Good faith efforts.

■ Appellees argue that the classifications the statute makes are not subject to heightened levels of scrutiny, because they require only good faith attempts to satisfy goals, and do not impose rigid quotas. Thus a bidder may satisfy the goals without being in one of the designated classes, and without subcontracting 23% of the work to businesses in the designated classes, so long as it shows good faith.

Analysis of this argument requires that a distinction be drawn between whether the classifications themselves are permissible, considered in section D, and whether a softer system of discrimination avoids the Equal Protection Clause. For now, we are discussing only the latter proposition, whether there is a classification at all, not the former, whether the classification is permissible.

Appellees are correct in their argument that the statute does not impose rigid quotas. A bidder in none of the designated classes can get a contract even though it subcontracts none of the work whatsoever to anyone in the designated classes. Indeed, the University's analysis says that Swinerton and Walberg's winning bid had this breakdown, well under 23%:

| Minority Participation | | MWDVBE Breakdown | |
|---|---|---|---|
| African American: | $ 19,980 | **MBE:** | 13.92% |
| Pacific Asian: | $ 3,000,000 | **WBE:** | 1.25% |
| Anglo: | $18,678,000 | **DVBE:** | 0.00% |

**Total Contract Amount: $21,698,000** [7]

But the statute still has firm requirements, enforced by rejection of low bids like Monterey Mechanical's, unless all the requirements are met. State agencies "shall award the contract to the lowest responsible bidder meeting or making good faith efforts to meet" the percentage "goals." Cal. Public Contract Code § 10115.2(a). That means that the state will not award a contract to a bidder which does neither. The "good faith efforts" have specific content. They require

documented efforts to identify, focus advertising on, and solicit and consider bids from, firms in the designated classes:

(b) A bidder shall be deemed to have made good faith efforts upon submittal within time limits specified by the awarding department of documentary evidence that all of the following actions were taken:

(1) Contact was made with the awarding department to identify minority, women, and disabled veteran business enterprises.

(2) Contact was made with other state and federal agencies, and with local minority, women, and disabled veteran business enterprise organizations to identify minority, women, and disabled veteran business enterprises.

(3) Advertising was published in trade papers and papers focusing on minority, women, and disabled veteran business enterprises, unless time limits imposed by the awarding department do not permit that advertising.

(4) Invitations to bid were submitted to potential minority, women, and disabled veteran business enterprise contractors.

(5) Available minority, women, and disabled veteran business enterprises were considered.

Cal. Public Contract Code § 10115.2(b). Adherence is monitored, Calif. Public Contract Code § 10115.3(a). Though the requirements allow for awards to bidders who do not meet the percentage goals, they are rigid in requiring precisely described and monitored efforts to attain those goals.

The question whether a non-rigid system of goals and good faith efforts, as opposed to rigid quotas, is treated as a classification under the Equal Protection Clause, is settled by existing precedent. *Bras v. California Public Utilities Commission,* 59 F.3d 869 (9th Cir.1995), dealt with a similar law, providing for "goals" and "methods for encouraging" minority and women subcontracts, and expressly abjuring "quotas." Cal. Pub.

---

7. Here are the University's categories and numbers for Monterey Mechanical:

| Minority Participation | | MWDVBE Breakdown | |
|---|---|---|---|
| African American | $ 262,000 | **MBE:** | 3.49% |
| Hispanic | $ 306,700 | **WBE:** | 1.29% |
| Native American | $ 15,788 | **DVBE:** | 0.0% |
| Asian Indian | $ 162,000 | | |
| "Anglo" | $20,633,512 | | |

**Total Contract Amount: $21,380,000**

Util.Code § 8283(b). The state argued that a challenger lacked standing because of the absence of rigid requirements. We held that the provisions were not "immunized from scrutiny because they purport to establish goals rather than quotas." *Bras,* 59 F.3d at 874. We construed *Northeastern Florida Contractors* to mean that "the relevant question is not whether a statue requires the use of such measures, but whether it authorizes or encourages them." *Bras,* 59 F.3d at 875.

*Bras* controls. In the case at bar, the statute does not require set-asides, but it encourages them. A bidder can avoid disqualification by seeing to it that 23% of the work goes to the designated classes, or showing that it tried to bring about that result. The Tenth Circuit has reached the same conclusion in an indistinguishable case, *Concrete Works of Colorado v. Denver,* 36 F.3d, 1513 (10th Cir.1994). The Denver ordinance at issue in that case was almost identical in material respects to the statute at issue here. It provided only for "goals" and "good faith" efforts to meet them, not quotas or rigid set-asides. Appellees do not cite any cases going the other way. We have no basis for setting up an intercircuit conflict on this settled issue.

It is much easier to imagine that good faith compliance, as opposed to meeting the goals by subcontracting out 23% of the work, might be *de minimis.* Good faith compliance does not cost millions of dollars. It does not seem much to ask of a bidder that it get the names of firms in the designated classes, advertise to them, and consider their bids. There is much appeal to enlarging the participation of minority-owned and women-owned firms by assuring that they as well as others receive full information on opportunities to bid.

But the question we are considering in this section of our opinion is whether the statute classifies, that is, whether it treats people differently by ethnicity or sex, not whether the purpose of the classification is attractive. The statute treats contractors differently according to their ethnicity and sex, with respect to the "good faith" requirement. It does not say that all contractors must assure that the opportunity to bid is advertised to all prospective subcontractors, including minority-owned and women-owned firms. Only those firms not minority or women owned must advertise to those respective groups, and only minority and women owned firms are entitled to receive the bid solicitation. A firm which is both minority and women owned, and keeps at least a fifth of the work, does not have to solicit any bids from firms identified by ethnicity or sex. If a minority and women owned firm does solicit bids from subcontractors, the firm is free under the statute before us to exclude non-minority, non-women owned firms from the solicitation.

We are not faced with a non-discriminatory outreach program, requiring that advertisements for bids be distributed in such a manner as to assure that all persons, including women-owned and minority-owned firms, have a fair opportunity to bid. The Equal Protection Clause as construed in *Adarand* applies only when the government subjects a "person to unequal treatment." There might be a non-discriminatory outreach program which did not subject anyone to unequal treatment. But this statute is not of that type.

Though worded in terms of goals and good faith, the statute imposes mandatory requirements with concreteness. The scheme requires the bid solicitation in the context of requiring "good faith efforts to meet [percentage] goals." Cal. Public Contract Code § 10115.2(a). It requires distribution of information only to members of designated groups, without any requirement or condition that persons in other groups receive the same information. Thus the statute may be satisfied by distribution of information exclusively to persons in the designated groups. Bidders in the designated groups are relieved, to the extent they keep the required percentages of work, of the obligation to advertise to people in their groups. The outreach the statute requires is not from all equally, or to all equally.

It is heuristically useful, in sorting out the question of whether a classification is made from the question whether the classification is permissible, to hypothesize the same provision in favor of white male firms. That way we can separate the question of whether the

discrimination is permissible, which it would not be for white male firms, from the question whether there is discrimination at all. If the statute required solicitation of subcontract bids only to white male-owned firms, and did not require that white-male-owned firms make any solicitation if they kept the work, a court might well find that the scheme "discriminate[d] against MBEs and WBEs and continued to operate under 'the old boy network' in awarding contracts." *Associated General Contractors v. Coalition for Economic Equity*, 950 F.2d 1401, 1414 (9th Cir. 1991). We would certainly conclude that the statute classified by ethnicity and sex.

The statutory classification also imposes higher compliance expenses on some firms than others, according to ethnicity and sex. To demonstrate "good faith," the bidder must contact the awarding department, state agencies, federal agencies, and minority and women organizations, to identify prospective subcontractors, locate and prepare advertisements for advertisements in papers focusing on those groups, and distribute invitations to bid to potential minority and women subcontractors. Cal. Public Contract Code § 10115.2(b). These efforts require time, which must be paid for, effort, and expense—they do not happen by themselves. The expenses—perhaps a few hundred or a few thousand dollars for wages and salaries, communications, and advertisements—are avoidable for firms in the designated classes to the extent they keep the required percentages of work for themselves.

■ More important, we can find no authority, and appellees have cited none, for a *de minimis* exception to the Equal Protection Clause. The Supreme Court has held that, "*any* person, of whatever race, has the right to demand that *any* governmental actor subject to the Constitution justify *any* racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand*, 515 U.S. at 224, 115 S.Ct. at 2111 (emphasis added). We conclude that there is no *de minimis* exception to the Equal Protection Clause. Race discrimination is never a "trifle."

## C. Heightened Scrutiny.

■ We have concluded so far that Monterey Mechanical had standing to challenge the constitutionality of the statute, and that the statute makes a classification subject to Equal Protection analysis. That does not end the inquiry into probability of success on the merits. The next question is whether the classification is permissible.

The Equal Protection Clause protects "persons, not groups, so group classifications are in most circumstances prohibited, and are subjected to detailed judicial inquiry to insure that the *personal* right to equal protection of the laws has not been infringed." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097, 2112–13, 132 L.Ed.2d 158 (1995). Likewise, "parties who seek to defend gender based government action must demonstrate an exceedingly persuasive justification for that action." *United States v. Virginia*, —— U.S. ——, ——, 116 S.Ct. 2264, 2274, 135 L.Ed.2d 735 (1996).

The Constitution entitles "any person" to equal protection of the laws. U.S. Const. Amend. 14, § 1. It draws no distinction by ethnicity or sex. The scrutiny applied to racial classifications "is not dependent on the race of those burdened or benefitted." *Adarand*, 515 U.S. at 222, 115 S.Ct. at 2110. An "exceedingly persuasive justification" must be presented for a sex classification, even if it "discriminates against males rather than against females." *Mississippi University for Women v. Hogan*, 458 U.S. 718, 723–24, 102 S.Ct. 3331, 3335, 73 L.Ed.2d 1090 (1982).

Racial classifications are subject to "strict scrutiny," and "are Constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand*, 515 U.S. at 226, 115 S.Ct. at 2113. Classifications based on sex must be justified by an "exceedingly persuasive justification," serve "important governmental objectives" and the means must be "substantially related to the achievement of those objectives." *United States v. Virginia*, —— U.S. ——, ——, ——, 116 S.Ct. 2264, 2274, 2275, 135 L.Ed.2d 735 (1996).

The statute benefits bidders and subcontractors who fit the classification "minority

business enterprise" and "women business enterprise." Cal. Public Contract Code § 10115.2(a). A "women business enterprise" must be "at least 51% owned by one or more women," "whose management and daily operations are controlled by one or more women who own the business." Cal. Public Contract Code § 10115.1(f). A "minority business enterprise" must meet the same criteria with respect to the designated minorities. Cal. Public Contract Code § 10115.1(e).

For a racial classification to survive strict scrutiny in the context before us, it must be a narrowly tailored remedy for past discrimination, active or passive, by the governmental entity making the classification. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 482–84, 490–91, 109 S.Ct. 706, 716, 720, 102 L.Ed.2d 854 (1989). "Findings of societal discrimination will not suffice; the findings must concern prior discrimination by the government unit involved." *Id.* at 485, 109 S.Ct. at 716–17; *and see Associated General Contractors v. City and County of San Francisco,* 813 F.2d 922, 930 (9th Cir.1987).

 The burden of justifying different treatment by ethnicity or sex is always on the government. "[A]ny person of whatever race has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand,* 515 U.S. at 224, 115 S.Ct. at 2111. For laws that classify by sex, "The burden of justification is demanding and it rests entirely on the State." *United States v. Virginia,* —— U.S. at ——, 116 S.Ct. at 2275.

In the case before us, the University offered no evidence whatsoever to justify the race and sex discrimination. When asked by Monterey Mechanical for statistics, the University said there were none. In their opposition papers to Monterey Mechanical's motion for preliminary injunction, the University and Swinerton & Walberg offered no evidence whatsoever that the University or the state had previously discriminated, actively or passively, against the groups benefitted by the statute. They never proposed to offer evidence of past discrimination in

any form at any time. There are legislative findings, but they do not say that California State University, or the California state government, has in the past actively or passively discriminated against the benefitted groups. Cal. Public Contract Code § 10115(a). There are no legislative findings, and no fact findings by the district court, of past discrimination against the benefitted groups by the state or the University.

Instead, the legislative findings say that markets, prices and personal opportunities will be advanced by "the policy of the state to aid the interests of minority, women and disabled veteran business enterprises." *Id.* Phrases in the legislative findings say and imply that these enterprises have an "economically disadvantaged position." Cal. Public Contract Code § 10115(a)(4). But the legislative findings do not say whether the "economically disadvantaged position" has to do with past active or passive discrimination by the State, other entities, general societal discrimination, or factors other than discrimination.

Because the state made absolutely no attempt to justify the ethnic and sex discrimination it imposed, we do not reach the questions of how much proof, or what kinds of legislative findings, suffice. Unlike *Associated General Contractors v. Coalition for Economic Equity,* 950 F.2d 1401, 1414 (9th Cir. 1991), there were no "detailed findings of prior discrimination" and no extensive evidence of discrimination submitted. Because appellees offered no evidence or argument justifying discrimination, we do not reach the question whether a more tolerant constitutional regime for sex discrimination would permit the part of the statute favoring women owned businesses to survive constitutional analysis if the part favoring minority businesses does not. *See United States v. Virginia,* —— U.S. ——, 116 S.Ct. 2264, 135 L.Ed.2d 735; *Associated General Contractors v. City and County of San Francisco,* 813 F.2d 922, 940–41 (9th Cir.1987). Even sex discrimination against males requires the state to bear the burden of justification. Likewise, because no justification has been offered for the group classifications at issue,

we do not reach the question whether group discrimination *ipso facto* violates individuals' rights to equal protection of the laws. *See Adarand,* 515 U.S. at 239, 240, 115 S.Ct. at 2118, 2119 (Scalia, concurring, and Thomas, concurring).

Even if the purpose of a discriminatory scheme is legitimate, the scheme can survive strict scrutiny only if it is "narrowly tailored" to serve a compelling governmental interest. *Wygant v. Jackson Board of Education,* 476 U.S. 267, 283, 106 S.Ct. 1842, 1852, 90 L.Ed.2d 260 (1986); *Adarand,* 515 U.S. at 235–37, 115 S.Ct. at 2117. The statute at issue is not "narrowly tailored." That it is not is shown by the same overbreadth in its definition of "minority" that the Supreme Court has noted for years in similar statutes. *Wygant,* 476 U.S. at 284 n. 13, 106 S.Ct. at 1852 n. 13; *City of Richmond v. J.A. Croson, Co.,* 488 U.S. at 505–06, 109 S.Ct. at 728:

(d) "Minority," for purposes of this section, means a citizen or lawful permanent resident of the United States is an ethnic person of color and who is: Black (a person having origins in any of the Black racial groups of Africa); Hispanic (a person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race); Native American (an American Indian, Eskimo, Aleut, or Native Hawaiian); Pacific–Asian (a person whose origins are from Japan, China, Taiwan, Korea, Vietnam, Laos, Cambodia, the Philippines, Samoa, Guam, or the United States Trust Territories of the Pacific including the Northern Marianas); Asian–Indian (a person whose origins are from India, Pakistan, or Bangladesh); or any other group of natural persons identified as minorities in the respective project specifications of an awarding department or participating local agency.

Cal. Public Contract Code § 10115.1(d).

In *Croson,* 488 U.S. at 505–06, 109 S.Ct. at 728, the Court was struck by the inclusion of Aleuts and Eskimos in a Richmond, Virginia, ordinance. Likewise, in *Wygant* the court said that the inclusion of groups highly unlikely to have been the victims of past discrimination by the school board "illustrate[ ]

the undifferentiated nature of the plan." *Wygant,* 476 U.S. at 284 n. 13, 106 S.Ct. at 1852 n. 13. The statute before us also lists groups highly unlikely to have been discriminated against in the California construction industry. The Aleuts, for example, a distinct people native to the western part of the Alaska peninsula and the Aleutian Islands, have suffered brutal oppression repeatedly in their history. But it would be frivolous to suggest that California State Polytechnic University at San Luis Obispo, or the State of California, have actively or passively discriminated against Aleuts in the award of construction contracts. In *Croson,* the Court observed in reference to Aleuts and Eskimos that "the gross overinclusiveness of Richmond's racial preference strongly impugns the city's claim of remedial motivation." *Id.* at 506, 109 S.Ct. at 728. Likewise here, some of the groups designated are, in the context of a California construction industry statute, red flags signalling that the statute is not, as the Equal Protection Clause requires, narrowly tailored.

The list in the statute before us might be explained by a laudable desire to improve the social position of various groups perceived to be less well off. Or conceivably those who drafted the statute for the legislature copied from a model form and neglected to strike its inapplicable portions. One explanation which is not plausible is the one needed as a justification, that the list is narrowly tailored to remedy past discrimination, active or passive, by the State of California. Appellees submitted no evidence and offer no argument to the contrary. "A broad program that sweeps in all minorities with a remedy that is in no way related to past harms cannot survive constitutional scrutiny." *Hopwood v. State of Texas,* 78 F.3d 932, 951 (5th Cir.1996).

We are compelled by firmly established law to conclude that the statute violates the Equal Protection Clause. The state has not even attempted to show that the statute is narrowly tailored to remedy past discrimination. The laudable legislative goal, that "the actual and potential capacity of minority, women, and disabled veteran business enterprises [be] encouraged and developed," Calif. Public Contract Code § 10115(a)(1), cannot

be achieved by ethnic and sex discrimination against individuals excluded by ethnicity or sex from these groups, in the absence of Constitutionally required justification.

### D. Irreparable Harm.

The district court concluded that Monterey Mechanical's probable success on the merits was low, so gave very limited consideration to whether it would suffer irreparable harm if interlocutory equitable relief were denied, and whether granting a preliminary injunction would impose hardship on the University and Swinerton and Walberg. *See Stanley v. University of Southern California,* 13 F.3d 1313 (9th Cir.1994); *Martin v. International Olympic Committee,* 740 F.2d 670, 674–75 (9th Cir.1984). The district court found that the balance of hardships did not tip "sufficiently" in favor of Monterey Mechanical, "especially in view of the possibility of loss of funding if the construction contract is not completed speedily."

The University argues that Monterey Mechanical was properly denied a preliminary injunction, even if its probability of success on the merits was high, because Monterey Mechanical demonstrated no irreparable harm, and the balance of hardships tipped in the University's favor. The University's evidence of hardship was that if a preliminary injunction stopped the project from proceeding while the litigation was pending, completion would probably be delayed until past the date when unencumbered funding would revert to a state bond reserve. Further, the University filed evidence that faculty and staff would be delayed in obtaining the benefits of the project, and the University would be delayed in enjoying the benefits of saving money on electricity because of the project. Monterey Mechanical showed two kinds of harm: (1) loss of the contract, and (2) unconstitutional discrimination in the bidding process based on race and sex. While money damages might remedy the first harm, it is not apparent to us how they would remedy the second.

"We have stated that an alleged constitutional infringement will often alone constitute irreparable harm." *Associated General Contractors v. Coalition For Economic Equity,*

950 F.2d, 1401, 1412 (9th Cir.1991). We have been compelled to conclude that the statute, insofar as it classifies by ethnicity and sex, is unconstitutional. That makes Monterey's probability of success much higher than it was when preliminary injunctive relief was considered in district court. We therefore remand so that the district court may reconsider preliminary equitable relief in light of our determination of unconstitutionality.

### CONCLUSION

All persons, of either sex and any ethnicity, are entitled to equal protection of the law. That principle, and only that principle, guarantees individuals that their ethnicity or sex will not turn into legal disadvantages as the political power of one or another group waxes or wanes. The statute at issue in this case violates the Equal Protection Clause, so the plaintiff's probability of success on the merits in their challenge to the ethnic and sex provisions of the statute is high. The district court must therefore reconsider the motion for preliminary injunction in light of the unconstitutionality of the statute.

REVERSED AND REMANDED.