COLUMBIA BASIN APARTMENT AS-SOCIATION; Bernard Shaw; Jean Shaw; Robert Lawrence; Joan Lawrence; Robert Lee Gaines; Billie Jean S. Gaines; Manuel Vala; Maria Galeana, Plaintiffs–Appellants,

v.

CITY OF PASCO, Defendant–Appellee.

No. 00–35041.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 2001

Filed Sept. 26, 2001

John J. McDermott, Jackson & Campbell, P.C., Washington, D.C., for the plaintiffs-appellants.

Leland B. Kerr (argued) and David D. Hilton, Evans, Kerr, Haney & Hilton, P.S., Kennewick, WA, for the defendant-appellee.

Before: ALARCON, FERNANDEZ, and TASHIMA, Circuit Judges.

Opinion by Judge ALARCON; Dissent by Judge TASHIMA

ALARCON, Circuit Judge:

Appellants appeal from the order granting summary judgment on the merits in favor of the City of Pasco. For the reasons stated below, we apply the *Younger* abstention doctrine to dismiss Bernard and Jean Shaw from this action, and apply the *Pullman* doctrine to vacate and remand the claims of the remaining Appellants with instructions to stay further proceedings until the Washington state courts have had the opportunity to consider the merits of the issues raised in the complaint under that state's law.

## I

## BACKGROUND

Appellants Bernard and Jean Shaw ("Shaws") and Robert and Joan Lawrence ("Lawrences") are landlords in the City of Pasco ("City"). The Shaws rent an apartment to Robert Lee Gaines and Billie Jean Gaines ("Gaineses"). The Lawrences rent an apartment to Manuel Vala ("Vala") and

Maria Galeana ("Galeana"). The Columbia Basin Apartment Association ("CBAA") is a nonprofit organization consisting of individuals and corporations that own and manage rental housing in the City.[1]

On July 7, 1997, the City enacted Ordinance 3231 ("Pasco Ordinance") to ameliorate sub-standard and dangerous rental dwelling units in the City. The Pasco Ordinance specifies in pertinent part that:

> Any person renting or making available for rent to the public any dwelling unit shall secure a license registering each dwelling unit including a certification warranting that each such dwelling unit complies with the Uniform Housing Code as adopted by the City and does not present conditions that endanger or impair the health or safety of the tenants.... Issuance of the business license shall be contingent upon submission of the certification, inspection, as required by this title, payment of the fee provided above and compliance with Chapter 5.78 of this title.

PMC 4.04.160(a). Chapter 5.78 of the Pasco Ordinance, in turn, prohibits renting "to the public any residential dwelling unit ... without securing and maintaining a current business license as required by this title." PMC 5.78.010. In addition, the Pasco Ordinance states in pertinent part that "[a]s a condition for the issuance of a license provided by this chapter, the applicant shall provide a certificate of inspection that all of the applicant's rental dwelling units comply with the standards of the Uniform Housing Code and do not present conditions that endanger or impair the

health or safety of a tenant." PMC 5.78.020(a). The Pasco Ordinance further provides that "[t]he applicant shall submit a certificate of inspection based upon the physical inspection of the dwelling units conducted not more than 90 days prior to the date of the certificate of inspection and compliance certified by" one of the following: (1) a City of Pasco Code Enforcement Officer; (2) the U.S. Department of Housing and Urban Development; (3) certified private inspectors approved by the City; (4) a Washington licensed structural engineer; or (5) a Washington licensed architect. PMC 5.78.020(c).

Finally, PMC 5.78.030 establishes civil penalties for violations of the Pasco Ordinance. Specifically, it states that "[a]ny person violating any of the provisions or failing to comply with any of the requirements of this chapter, shall upon a finding that the act or omission had been committed, be punishable by a fine of not more than $500 dollars and shall be guiltily [sic] of a code infraction. Each such person is guilty of a separate code infraction for each and every day during any portion of which any violation of any provision ... is committed...." PMC 5.78.030(a). "In addition to the penalties provided above, any violation of this chapter may result in the revocation of the business licenses provided by this title. Any violation of this chapter ... may ... result in the issuance of a notice of civil violation ... subject to the penalties as imposed under the provisions of this code." PMC 5.78.030(c).[2]

---

**1.** For ease of reference, we herein refer to the collective group of appellants as "Appellants" except when it is necessary to distinguish among them.

**2.** The Pasco Ordinance also establishes criminal penalties: "Any person who knowingly submits or assists in the submission of a falsified certificate of inspection ... shall, in

addition to the penalties provided in the subsection(a) above be guilty of a gross misdemeanor and shall be punished by a fine of not more than $5,000 dollars or by imprisonment for each separate offense ..." 5.78.030(b). This subsection is not implicated in this case.

The Gaineses have refused to consent to an inspection of their apartment. Consequently, their landlords, the Shaws, have refused to allow the City inspector to have access to the Gaineses' apartment. Vala and Galeana have also refused to consent to an inspection of their apartment. As a result, the Lawrences have refused to allow an enforcement officer to inspect Vala and Galeana's apartment. The Lawrences and the Shaws have notified the City that they are unable to comply with the Pasco Ordinance because their tenants object to the inspections.

In response, the City has repeatedly informed the Shaws that failure to comply with the Pasco Ordinance may result in (1) civil penalties; (2) imprisonment;[3] (3) revocation of their business license; (4) closure of the building; and (5) eviction of the tenants. On January 26, 1999, the City filed a civil action against the Shaws in Franklin County Superior Court, requesting, inter alia, an injunction to: (1) restrain the Shaws from conducting the business of residential rentals in the City without a valid business license; and (2) enforce their compliance with the Pasco Ordinance. The City has threatened the Lawrences with taking action to enforce its civil remedies against them for failing to comply with the Pasco Ordinance, but has not yet taken any enforcement measures.

On January 26, 1999, Appellants filed the present action in federal district court seeking declaratory and injunctive relief under 42 U.S.C. § 1983. The complaint alleges that:

[T]he City's application of the Ordinance is constitutionally invalid because it: (i) violates the constitutional protection from unreasonable searches and seizures set forth in the Fourth Amendment to the Constitution of the United States; (ii) is constitutionally vague, thereby depriving Plaintiffs of due process guaranteed by the Fourteenth Amendment to the U.S. Constitution; and (iii) mandates the payment of "fees" which constitute an illegal tax.

The record reflects that at some point during the pendency of the federal suit, the City and the Shaws jointly agreed to stay the state proceeding pending resolution of the Appellants' action in federal court.

On October 6, 1999, the City moved for summary judgment in this matter. The district court granted the motion. It ruled that the Pasco Ordinance does not implicate the Fourth Amendment because it permits landlords to conduct private inspections. The district court also determined that the Pasco Ordinance does not require landlords to act as state actors in inspecting the tenants' residences. We have jurisdiction over this timely appeal under 28 U.S.C. § 1291.

II

STANDING

■■■ Because the group of Appellants is comprised of landlords, tenants, and an organization, three groups with distinct interests, we first consider their standing to maintain this action. "Although raised by neither of the parties, we are first obliged to examine the standing of appellees, as a matter of the case-or-controversy requirement associated with Art. III, to seek injunctive relief in the District Court." *Juidice v. Vail*, 430 U.S. 327, 331, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). "Standing is a question of law reviewed de novo."

---

**3.** The City concedes on appeal that none of the Appellants in this case is subject to criminal penalties under the Pasco Ordinance and that this aspect of the correspondence between the parties was in error.

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 706 (9th Cir.1997) (quoting *Snake River Farmers' Ass'n v. Dep't of Labor*, 9 F.3d 792, 795 (9th Cir.1993) and reviewing standing sua sponte).

■ Three elements are required to establish Article III standing:

First, the plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176 (9th Cir.2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

We conclude that all of the Appellants have standing in this case. The tenants assert that enforcement of the Pasco Ordinance in the face of their exercise of their Fourth Amendment right to be free from unreasonable searches is likely to result in their eviction. The tenants maintain that unless they consent to an allegedly unreasonable search, the City will deprive their landlords of business licenses and the buildings will be condemned. Eviction is a concrete injury. *See Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 446–47 (9th Cir.1994) (holding threat of eviction is concrete, real threat to interests of residents sufficient to comprise injury in fact). This injury is sufficiently imminent because the City has sued the Shaws and notified the Lawrences that it intends to enforce the Pasco Ordinance against them. *See Darring v. Kincheloe*, 783 F.2d 874, 877 (9th Cir.1985) ("A threatened injury may be justiciable."); *cf. Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298–99, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ("When plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court."); *Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (same). The tenants' injuries are fairly traceable to the challenged action of the City—the enforcement of the Ordinance. And finally, it is likely that these injuries will be redressed by a declaration that the Pasco Ordinance is unconstitutional. Thus, the tenants have standing.

■ The landlords allege in the complaint that enforcement of the Pasco Ordinance will violate their Fourteenth Amendment due process rights.[4] The landlords contend that the Pasco Ordinance compels them to either violate the Fourth Amendment rights of their tenants by insisting on inspection, or lose their business licenses.[5]

---

4. The complaint reads in pertinent part:

22. The individual Plaintiffs have not consented, nor will they consent, to the warrantless entry by government officials onto their property.

23. In the face of this exercise of constitutional rights, the City's decision to terminate or, in the alternative, not issue business licenses will deprive owners and residents of due process.

Counsel for the landlords reiterated this argument in oral argument before this court in response to a question regarding the landlords' standing.

5. From the record before us, it is somewhat unclear whether the City has issued the

This allegation is sufficient to demonstrate an injury in fact. We have held that "[a] person suffers injury in fact if the government requires or encourages as a condition of granting him a benefit that he discriminate against others based on their race or sex." *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 707 (9th Cir.1997). If the Pasco Ordinance requires the landlords to invade the Fourth Amendment rights of their tenants in order to obtain their business licenses, this is no less of an injury than requiring a person to discriminate on the basis of race or gender in order to obtain a governmental benefit. *See Harris v. United States*, 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) ("This Court has consistently asserted that the rights of privacy and personal security protected by the Fourth Amendment ... are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizens."), *overruled on other grounds by Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Thus, the City's enforcement of the Pasco Ordinance may impermissibly threaten the landlords with a deprivation of property and civil penalties if they are unwilling to violate the Fourth Amendment rights of their tenants. *See Groten v. California*, 251 F.3d 844, 850–51 (9th Cir.2001) (statute establishing standards for business license may create property interest protected by the Due Process Clause); *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir.1996) ("Economic injury is clearly a sufficient basis for

standing."). In addition, the enforcement of the Pasco Ordinance exposes the landlords to the risk of litigation. *Cf. Wilson*, 125 F.3d at 708 (holding that the person "required to discriminate also suffers injury in fact because the statute exposes him to risk of liability for the discrimination").

The threat of these injuries is sufficiently imminent. The landlords' injuries are fairly traceable to the challenged action of the City—the enforcement of the Ordinance. And finally, it is likely that these injuries will be redressed by a declaration that the Pasco Ordinance is unconstitutional. Thus, the landlords have standing.

 The record does not show whether CBAA has suffered, or been threatened with, an injury as an organization *qua* organization. However, an organization may have standing to assert the claims of its members even where it has suffered no direct injury from a challenged activity. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 341, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). An organization has standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1406 (9th Cir.1991) (quoting *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434).

The first prong of the *Hunt* test for organizational standing is satisfied for the reasons stated above. As landlords resident in Pasco, CBAA's membership faces a

Shaws and the Lawrences business licenses in the past and has threatened revocation or nonrenewal of those licenses due to their noncompliance with the Pasco Ordinance, or whether the City has simply refused to issue licenses to the Shaws and the Lawrences. At

least one piece of correspondence in the record suggests that the City has threatened revocation of existing licenses. In either event, the Shaws and the Lawrences face the threat of a concrete injury.

threat of injury whenever a tenant refuses to permit inspection. The second prong of *Hunt* is also satisfied because the interest of CBAA in insuring that its members do not lose their renter's licenses for violating the Pasco Ordinance is clearly germane to CBAA's purpose of benefitting Pasco landlords.

In order to meet the third prong of the *Hunt* test, the CBAA's "claims proffered and relief requested [must] not demand individualized proof on the part of its members." *Id.* at 1408. Appellants request only injunctive and declaratory relief. Because these forms of relief do not require individualized proof, the third prong of the *Hunt* test is satisfied. *Id.; see Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 938 (9th Cir.1987) ("[b]ecause the [organization] seeks declaratory and prospective relief rather than money damages, its members need not participate directly in the litigation."). CBAA has constitutional standing to sue.

## III

## YOUNGER ABSTENTION

As noted above, the City filed a civil action against the Shaws in the Superior Court of Franklin County, Washington, requesting an injunction to compel the Shaws to comply with the Pasco Ordinance. Pursuant to a joint request of the parties, the state court stayed that proceeding pending resolution of this federal action. The existence of a pending state court proceeding filed by the City presents the question whether the district court should have abstained under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

In *Younger*, the Supreme Court "'espouse[d] a strong federal policy against federal-court interference with pending state judicial proceedings.'" *H.C. v. Koppel*, 203 F.3d 610, 613 (9th Cir.2000) (quoting *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)). The *Younger* principle applies to civil proceedings, such as these, in which important state interests are involved. *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). "'Absent extraordinary circumstances, *Younger* abstention is required if the state proceedings are (1) ongoing, (2) implicate important state interests, and (3) provide the plaintiff an adequate opportunity to litigate federal claims.' When the case is one in which the *Younger* doctrine applies, the case must be dismissed." *Koppel*, 203 F.3d at 613 (citations omitted). As a threshold condition to the above three requirements, "*Younger* applies only when the relief the plaintiff seeks in federal court would 'interfere' with the ongoing state judicial proceeding." *Green v. City of Tucson*, 255 F.3d 1086, 1098 (9th Cir.2001) (en banc).

The *Younger* doctrine may be raised sua sponte at any time in the appellate process. *Koppel*, 203 F.3d at 613. Nevertheless, we are not required to raise *Younger* sua sponte because the doctrine does not implicate our subject matter jurisdiction. *Dayton Christian Schs.*, 477 U.S. at 626, 106 S.Ct. 2718 (stating that *Younger* abstention "does not arise from lack of jurisdiction in the District Court, but from strong policies counseling against the exercise of such jurisdiction where particular kinds of state proceedings have already been commenced."); *see also Hydrostorage, Inc. v. N. Cal. Boilermakers Local Joint Apprenticeship Comm.*, 891 F.2d 719, 725 (9th Cir.1989) (stating that an appellate court is not required to raise *Younger* sua sponte). As the Supreme Court has explained:

Younger and [its progeny] express equitable principles of comity and federalism. They are designed to allow the State an opportunity to "set its own house in order" when the federal issue is already before a state tribunal. It may not be argued, however, that a federal court is compelled to abstain in every such situation. If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system.

*Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 479–80, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *see also Dayton Christian Schs.,* 477 U.S. at 626, 106 S.Ct. 2718 ("A state may ... voluntarily submit to federal jurisdiction even though it might have had a tenable claim for [*Younger*] abstention.").

Thus, the Supreme Court has held that a state may waive its right to raise *Younger* abstention on appeal where "the State expressly urge[s] ... the District Court to proceed to an adjudication of the constitutional merits." *Dayton Christian Schs.,* 477 U.S. at 626, 106 S.Ct. 2718. Here, the record does not reflect that the City "expressly urge[d]" the district court to adjudicate the constitutional merits of this case. *Id.* On the contrary, the City filed its claims in state court. The Appellants filed this matter in a federal forum. *See Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson,* 48 F.3d 391, 394 (9th Cir.1995) (holding state waived *Younger* abstention by expressly urging district court to adjudicate merits); *Boardman v. Estelle,* 957 F.2d 1523, 1535 (9th Cir.1992) (per curiam) (stating in dictum that "[a] state may waive *Younger* only by express statement, not through failure to raise the issue"); *see also Kendall–Jackson Winery, Ltd. v. Branson,* 212 F.3d 995, 997 (7th Cir.2000) (suggesting that, under *Younger,* "[p]erhaps federal

judges have the power to disregard a forfeiture (as opposed to a waiver), just as they have discretion to overlook a state's failure to assert the exhaustion requirement in a collateral attack on a criminal judgment."); *cf. United States v. Perez,* 116 F.3d 840, 845 (9th Cir.1997) (explaining in context of invited error doctrine that "[f]orfeiture is the failure to make a timely assertion of a right, whereas waiver is the 'intentional relinquishment or abandonment of a known right.' "). Therefore, we apply the *Younger* analysis to the Shaws' claims and conclude that all of the requirements are met.

As an initial matter, the threshold condition for application of *Younger* is present in this case. In the state proceeding, the City requests, inter alia, a permanent injunction to restrain the Shaws from conducting the business of residential rentals in Pasco without a valid business license, a determination that the Shaws are guilty of an infraction for each day of conducting business within Pasco without a license, and judgments against the Shaws in the amount of $500.00 per day. In this proceeding, the Shaws do more than simply "challeng[e] the constitutionality of a state statute." *Green,* 255 F.3d at 1098. They request that a federal court, inter alia, (1) declare that the license fees imposed by the Pasco Ordinance are illegal; (2) restrain the City from enforcing or collecting the fees imposed by the Pasco Ordinance; and (3) restrain the City from revoking their business licence for failure to comply with the Pasco Ordinance. Thus, the relief the Shaws seek in federal court would interfere with the ongoing state judicial proceeding. *Cf. Green,* 255 F.3d at 1098 (holding no interference where "the federal court action did not seek to enjoin, declare invalid, or otherwise involve the federal courts in terminating or truncating the state court proceeding."); *Fresh Int'l*

Corp. v. Agric. Labor Relations Bd., 805 F.2d 1353, 1360 n. 8 (9th Cir.1986) ("*Younger* abstention ordinarily would not apply when a federal plaintiff also is the plaintiff in state court."); *Confederated Salish v. Simonich*, 29 F.3d 1398, 1405 (9th Cir. 1994) (holding that the district court did not err in refusing to abstain under *Younger* where the federal plaintiff, who was also the state-court plaintiff did not seek to "restrain[ ] state proceedings or invalidat[e] a state law.").

We now turn to the three criteria for application of *Younger* abstention. The first criterion is satisfied because the City's state court suit against the Shaws was pending at the time this suit was filed. *San Remo Hotel v. City & County of San Francisco*, 145 F.3d 1095, 1104 (9th Cir. 1998) (holding stayed state court proceeding is "ongoing" under *Younger*); *Wiener v. County of San Diego*, 23 F.3d 263, 266 (9th Cir.1994) ("To decide whether there was a pending state judicial proceeding within *Younger*, we focus on the status of the state court proceeding at the time of the district court's decision rather than on its *current* status on appeal."); *Kitchens v. Bowen*, 825 F.2d 1337, 1341 (9th Cir.1987) ("[T]he critical question is not whether the state proceedings are still 'ongoing,' but whether 'the state proceedings were underway before initiation of the federal proceedings.'"). *But cf. Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1106–07 (9th Cir.1988) (holding no "ongoing" state proceeding where remanded state proceeding was stayed during second federal appeal and City had not raised abstention in district court, nor in two appeals to the Ninth Circuit, nor in appeal to the Supreme Court).

The second criterion is met because the City has a strong interest in its land-use ordinance and in maintaining habitable dwellings for its residents. *Cf. San Remo*

*Hotel*, 145 F.3d at 1104 (holding municipality has strong interest in land-use ordinance and in providing uniform procedures for resolving zoning disputes); *Mission Oaks Mobile Home Park v. City of Hollister*, 989 F.2d 359, 361 (9th Cir.1993) (rent control), *overruled on other grounds by Green*, 255 F.3d 1086. As discussed in further detail below, Washington has also expressed a particularly strong interest in the privacy of its citizens by affording more protection to its citizens than the federal Constitution. *See e.g., State v. Simpson*, 95 Wash.2d 170, 622 P.2d 1199, 1205 (1980) (en banc) (noting that, unlike the federal Constitution, Washington "clearly recognizes an individual's right to privacy with no express limitations"). Finally, the third criterion is satisfied because the Shaws have an opportunity to pursue their federal claims in the ongoing state proceeding. We therefore dismiss the Shaws' claims under *Younger*.

## IV

### PULLMAN ABSTENTION

■■■■■ We next consider whether the claims of the remaining Appellants warrant abstention under *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The *Pullman* abstention doctrine "is a narrow exception to the district court's duty to decide cases properly before it. *Pullman* allows postponement of the exercise of federal jurisdiction when 'a federal constitutional issue ... might be mooted or presented in a different posture by a state court determination of pertinent state law.'" *Kollsman v. City of Los Angeles*, 737 F.2d 830, 833 (9th Cir.1984). Specifically, *Pullman* holds that "federal courts should abstain from decisions when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided. By abstaining in

such cases, federal courts ... avoid both unnecessary adjudication of federal questions and 'needless friction with state policies....'" *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (citation omitted). If we abstain "under *Pullman,* retention of jurisdiction, and not dismissal of the action, is the proper course." *Santa Fe Land Improvement Co. v. City of Chula Vista,* 596 F.2d 838, 841 (9th Cir.1979).

■ While we may sua sponte consider *Pullman* abstention at any time, *San Remo Hotel,* 145 F.3d at 1105, we are never *required* to apply *Pullman* because, like *Younger* abstention, the doctrine does not implicate our subject matter jurisdiction. *Hydrostorage, Inc.,* 891 F.2d at 725. Unlike *Younger,* however, the concerns underlying the *Pullman* doctrine are not necessarily diminished when the state has consented to federal jurisdiction. In *Ohio Bureau of Employment Services v. Hodory,* the Supreme Court declined to apply *Younger* because the state had voluntarily chosen to submit to a federal forum. 431 U.S. at 480, 97 S.Ct. 1898. The Supreme Court nevertheless considered application of the *Pullman* doctrine, reasoning that, "Pullman abstention, where deference to the state process may result in elimination or material alteration of the constitutional issue, surely does not require that this Court defer to the wishes of the parties concerning adjudication." *Id.* at 480 n. 11, 97 S.Ct. 1898; *see also San Remo Hotel,* 145 F.3d at 1104 ("Nor do we refuse to consider *Pullman* abstention because it was not raised before the district court."); *Kendall–Jackson Winery,* 212 F.3d at 997 (noting that *Hodory* implies that an appellate court retains the *power* to consider abstention despite the state's "waiver"); *Inter'l College of Surgeons v. City of Chicago,* 153 F.3d 356, 360–61 & n. 4 (7th Cir.1998) (holding that failure of a party to raise *Pullman* doctrine in district court will not necessarily operate as a waiver, while noting that a state may waive an abstention argument based on *Younger*). As set forth below, we conclude that *Pullman* abstention is appropriate in this case.

■ This court utilizes three criteria for the application of the *Pullman* doctrine. First, the case must touch on a sensitive area of social policy upon which federal courts ought not to enter unless no alternative to its adjudication is open. Second, it must be plain that the constitutional adjudication can be avoided if a definite ruling on the state issue would terminate the controversy. Finally, the possible determinative issue of state law must be uncertain. *Confederated Salish,* 29 F.3d at 1407.

In this case, all three criteria are met. First, "[w]e often have held that land-use planning questions 'touch a sensitive area of social policy' into which the federal courts should not lightly intrude." *Pearl Inv. Co. v. City & County of San Francisco,* 774 F.2d 1460, 1463 (9th Cir.1985); *Rancho Palos Verdes Corp. v. City of Laguna Beach,* 547 F.2d 1092, 1095 (9th Cir. 1976) (holding land use planning is sensitive area of social policy).

The second criterion for abstention is met because interpretation of the validity of the Pasco Ordinance under the Washington Constitution may eliminate the need to determine whether it also violates the federal Constitution. In addition, under the third criterion, the validity of the Pasco Ordinance under the Washington Constitution is uncertain. To describe the Washington constitutional issue adequately, we must set forth a brief summary of the current state of administrative search law in Washington. This begins with the federal constitutional standard set forth in *Camara v. Mun. Court of the City &*

*County of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

In *Camara* the Court held that state actors require a warrant supported by probable cause in order to perform non-consensual administrative searches in compliance with the Fourth Amendment. *Id.* at 533, 538, 87 S.Ct. 1727. The Court determined that, while the standards for probable cause "will vary with the municipal program being enforced, [they] may be based on the passage of time, the nature of the building (e.g., a multifamily apartment house), or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling." *Id.* at 538, 87 S.Ct. 1727. In so doing, the Court explicitly lowered the probable cause test from the standard applied in criminal cases, reasoning that "[t]he warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable government interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." *Id.* at 538–39, 87 S.Ct. 1727.

The Washington Supreme Court rejected *Camara* in two en banc opinions. First, in *City of Seattle v. McCready,* 123 Wash.2d 260, 868 P.2d 134 (1994) (en banc) ("*McCready I* "), building owners appealed from the grant of the city of Seattle's warrant applications, which permitted city officials to inspect their buildings for housing code violations on less than probable cause. On appeal, the building owners argued that the search warrants violated Wash. Const. art. I, § 7. Specifically, they urged the court to reject the Fourth Amendment standards for administrative inspection established in *Camara. Id.* at 138. The Washington Supreme Court declined to address that argument, finding

that "such a ruling [was] unnecessary to the resolution" of the case. *Id.* Instead, the court addressed the question "whether the Superior Court had the authority to issue the[ ] search warrants." *Id.* at 140.

The court determined that "the solution to this case is found in the unique characteristics of Const. art. 1, § 7, particularly its language, and pre-existing state case and statutory law." *Id.* at 138. Article I, section 7 of the Washington Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Wash. Const. art. I, § 7. This language is significantly different from that present in its federal counterpart, the Fourth Amendment to the United States Constitution. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV.

The Washington Supreme Court has made it emphatically clear that "Const. art. I, § 7 provides protections for the citizens of Washington which are qualitatively different from, and in some cases broader than those provided by the Fourth Amendment." *McCready,* 868 P.2d at 137–38; *see also State v. Stroud,* 106 Wash.2d 144, 720 P.2d 436, 439 (1986) (en banc) (Wash. Const. art. I, § 7 "affords individuals greater protections against warrantless searches than does the Fourth Amendment."); *State v. Simpson,* 95 Wash.2d 170, 622 P.2d 1199, 1205 (1980) (en banc) ("Const. art. 1, § 7 differs from the Fourth Amendment in that it clearly recognizes an individual's right to privacy with no express limitations."); *State v.*

*White*, 135 Wash.2d 761, 958 P.2d 982, 985 (1998) ("We have often diverged from the United States Supreme Court's Fourth Amendment jurisdiction, and we have more narrowly defined the exceptions to the search warrant requirements."). *But cf. In re Meyer*, 142 Wash.2d 608, 16 P.3d 563, 568–69 (2001) (en banc) (stating that Wash. Const. art. I, § 7 "provides no more protection than the federal constitution in the context of the interest in confidentiality, or the nondisclosure of personal information.").[6]

The *McCready I* court concluded that the broader protection of the Washington Constitution dictates that "Const. art. 1, § 7 prohibits courts from issuing warrants without an authorizing statute or court rule." 868 P.2d at 141. The court then reviewed RCW 19.27.031, which incorporates several uniform housing codes, to determine if any of them provides legislative authority for the issuance of a warrant to enforce Seattle's inspection ordinance. *Id.* at 143. "Each of these codes grants inspectors a 'right of entry' for enforcement purposes." *Id.* Seattle contended that the "right of entry" indicated a legislative intent to authorize superior courts to issue warrants in support of enforcement activities. *Id.* The court rejected Seattle's argument, holding that "a right of entry, and even an authorization to seek a warrant to implement a right of entry, is not equivalent to a legislative authorization for a court to issue a warrant *on less than probable cause.*" *Id.* (emphasis added). In so holding, the court noted that:

Even if the code itself provided for a warrant, this does not itself imply that a statute is categorically sufficient to provide the authority of law necessary to satisfy Const. art. 1, § 7.... In this case, we examine the uniform codes because, prior to examining whether a particular statute may satisfy Const. art. 1, § 7, it is necessary to determine whether an applicable statute exists. Since we conclude that there is no such statute, we do not consider whether a specific authorizing statute would otherwise pass constitutional muster.

*Id.* at 144 n. 11.

Subsequently, in *McCready II*, the Washington Supreme Court decided "the question *McCready I* did not explicitly reach, namely whether a municipal court possesses the authority to issue an administrative search warrant *supported by probable cause.*" *City of Seattle v. McCready*, 124 Wash.2d 300, 877 P.2d 686, 688 (1994) (en banc) ("*McCready II*"). The court held that "[o]f the statutes and court rules cited by the City, none authorizes the issuance of administrative inspection warrants supported by probable cause to believe a civil infraction, rather than a crime, has occurred." *Id.* at 691. Specifically, the court reviewed RCW 10.79.015 and several court rules and concluded that "[u]nder these rules, the municipal court has authority to issue administrative search warrants supported by probable cause only if the application for the inspection warrant alleges a housing code viola-

---

**6.** The Washington Supreme Court has determined that "[t]he relevant inquiry under the Washington [C]onstitution in determining whether there has been a search is 'whether the State has unreasonably intruded into a person's "private affairs." ' " *State v. Young*, 123 Wash.2d 173, 867 P.2d 593, 597 (1994) (en banc) (citation omitted). "The private affairs inquiry is broader than the Fourth Amendment's reasonable expectation of priva-

cy inquiry. Under the Fourth Amendment, a search occurs if the government intrudes upon a subjective and reasonable expectation of privacy. However, under the Washington [C]onstitution the inquiry focuses on 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.' " *Id.* (citations omitted).

tion which constitutes a *crime* rather than a civil infraction." *Id.* at 692.

In this case, the parties agree that in order to comply with the Fourth Amendment standard enunciated in *Camara*, state officials must obtain warrants to inspect the apartments of nonconsenting tenants. The Washington Supreme Court's decisions in *McCready I* and *McCready II* make clear that the Washington Constitution requires a Washington statute, court rule, or judicial opinion authorizing the issuance of such warrants. If no such authority exists, it is impossible for inspectors to comply with the Washington Constitution in circumstances where the tenants refuse to consent to the inspection.

The City cites three Washington statutes as possibly providing such authorization when read in concert. First, RCW § 59.18.150 grants landlords a right of entry in certain circumstances. The statute provides in pertinent part:

(1) The tenant shall not unreasonably withhold consent to the landlord to enter into the dwelling unit in order to inspect the premises, make necessary or agreed repairs, alterations, or improvements, supply necessary or agreed services. . . . (4) The landlord has no other right of access except by court order, arbitrator or by consent of the tenant. (5) A landlord or tenant who continues to violate this section after being served with one written notification alleging in good faith violations of this section . . . shall be liable for up to one hundred dollars for each violation after receipt of the notice.

RCW 59.18.150. In addition, the City cites to two provisions of the Washington's Landlord–Tenant Act, RCW 59.18.060 and RCW 59.18.115. RCW 59.18.060 requires that landlords maintain the habitability of their buildings. It provides in pertinent part:

The landlord will at all times during the tenancy keep the premises fit for human habitation, and shall in particular: (1) Maintain the premises to substantially comply with any applicable code, statute, ordinance, or regulation governing their maintenance or operation, which the legislative body enacting the applicable code, statute, ordinance or regulation could enforce as to the premises rented if such condition substantially endangers or impairs the health or safety of the tenant.

RCW 59.18.060. RCW 59.18.115 provides tenants a means to enforce 59.18.060. It provides:

(2)(a) If a landlord fails to fulfill any substantial obligation imposed by RCW 59.18.060 that substantially endangers or impairs the health or safety of a tenant . . . the tenant shall give notice in writing to the landlord . . . (b) If after receipt of the notice described in (a) . . . the landlord fails to remedy the condition . . . the tenant may request that the local government provide for an inspection of the premises . . .

RCW 59.18.115.

The City contends that together with the Pasco Ordinance, these three statutes comprise "reasonable legislative or administrative standards for conducting inspections." Specifically, the City maintains that an "order of entry" issued pursuant to RCW 59.18.159 is the functional equivalent of an administrative search warrant. Appellants agree that an order of entry is equivalent to a search warrant but contend that "[t]here is simply no basis to conclude that a Washington [c]ourt could issue a RCW 59.18.150 'entry order' after *McCready* was decided." Alternatively, Appellants suggest that we certify this question to the Washington Supreme Court. The district court correctly observed that in order to issue an inspection

warrant, Washington courts "must find their authority in a statute or court rule." Although the court stated that "[n]o statute quite fits," the court speculated that "[i]t could be argued that an entry order issued pursuant to RCW 59.18.150 is the functional equivalent of a warrant." While the Washington Supreme Court may ultimately agree with this proposition, existing Washington law does not clearly dictate this result.

No Washington court has evaluated the constitutionality of Pasco Ordinance No. 3231 under Art. 1, § 7.[7] Thus, no Washington court has determined whether the Washington Landlord–Tenant Act, the "right of entry" statute, RCW 59.18.150, or any other statute for that matter, provides the requisite authorization for Washington courts to issue administrative warrants to enforce the Pasco Ordinance. The parties have cited no Washington authority discussing whether an order of entry under 59.18.150 is the functional equivalent of a warrant or whether an order of entry is permissible in light of *McCready I* and *McCready II*. These are novel and uncertain questions of state law in light of the substantial differences between the Fourth Amendment and Art. 1, § 7 set forth in *McCready I* and *McCready II*. Abstention is therefore appropriate. *Cf. Reetz v. Bozanich,* 397 U.S. 82, 86, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) (abstaining under *Pullman* where provisions of Alaska Constitution had never been interpreted by Alaska court).

Because the Pasco Ordinance implicates a state constitutional provision that differs significantly from the Fourth Amendment, *Pullman* abstention is particularly appropriate. *Midkiff,* 467 U.S. at 237 n. 4, 104 S.Ct. 2321 ("The Court has previously determined that abstention is not required for interpretation of parallel state constitutional provisions."); *Midkiff v. Tom,* 702 F.2d 788, 799–800 (9th Cir.1983) (Poole, J., concurring) ("*Pullman* abstention may also be appropriate where a state court may find that the challenged statute violates the state's own constitution. But such abstention is limited to application of a specialized state constitutional provision with no clear counterpart in the federal constitution."), *rev'd on other grounds,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984); *Pue v. Sillas,* 632 F.2d 74, 80 (9th Cir.1980) ("The Court reaffirmed the distinction ... between state constitutional provisions which are integrally related to the challenged state statutory scheme and those which simply mirror the federal constitution in *Examining Board of Eng'rs Architects & Surveyors v. Flores de Otero,* [426 U.S. 572, 598, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976)]."); Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 17A Fed. Prac. & Proc. Juris.2d § 4242 (1988) ("The proper line appears to be that abstention is in order if the case may turn on the interpretation of some specialized state constitutional provision, but not if the state provision is substantially similar to the federal provision that is the basis of the federal challenge.").

## V

## CONCLUSION

Because the relief sought by the Appellants regarding the validity of the Pasco

---

**7.** The district court noted that "[i]t seems striking that the parties have not cited (and the Court's own research has not located) a single decision from any jurisdiction, published or unpublished, addressing Pasco's licensing system. This is probably explainable by

*McCready.* If a jurisdiction has a procedure in place for issuing administrative warrants for civil violations, that jurisdiction, can remain true to the letter, as well as the spirit, of *Camara.* Washington may stand alone in this regard."

Ordinance may be available under Washington law, we conclude that the district court should not have decided the merits of the federal constitutional claims presented in this complaint. The order granting summary judgment in favor of the City is VACATED. We REMAND this matter of the district court with instructions to dismiss the claims filed by the Shaws, and to stay all further proceedings until the state courts of Washington have finally determined any proceedings filed by the parties regarding the validity of the Pasco Ordinance.

VACATED AND REMANDED.

TASHIMA, Circuit Judge, dissenting:

Because I cannot agree with either the majority's resolution of the jurisdictional issue or its decision to order abstention, I respectfully dissent. In my view, none of the appellants has established Article III standing, and the majority's resolution of the abstention issue is squarely at odds with recent, controlling, en banc authority.

**I.**

With respect to standing, there are three classes of plaintiffs-appellants. I address the standing of each, in turn.

The majority grants Article III standing to the landlord-plaintiffs on the basis of the statement in *Monterey Mech. Co. v. Wilson,* 125 F.3d 702, 707 (9th Cir.1997), that "[a] person suffers injury in fact if the government requires or encourages as a condition of granting him a benefit that he discriminate against others based on their race or sex." *See* maj. op. at 798 (quoting *Monterey Mech.*). But the reason we found injury in that case is missing in this case. We there concluded that requiring a person to discriminate on the basis of ethnicity or sex caused injury because "Americans view ethnic or sex discrimination as 'odious.' " *Monterey Mech.,* 125 F.3d at

707 (quoting *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 214, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)). Such discrimination is "wrong." *Id.* But there is nothing "odious" or morally "wrong" about a landlord reserving in a lease the right of reasonable inspection of the leased premises. In fact, such provisions are commonly included in both commercial and residential leases. Thus, *Monterey Mech.* will not bear the weight that the majority seeks to place on it.

Because the landlord-plaintiffs have not suffered a cognizable "injury," they lack Article III standing.

As the majority recognizes, the standing of the Columbia Basin Apartment Association ("CBAA") depends on the standing of its members. *See* maj. op. at 798–00. The CBAA, however, fails to meet the first requirement of *Hunt,* that in order for any organization to have standing, "its members [must] otherwise have standing to sue in their own right. . . ." *Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333, 341, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). As the discussion above demonstrates, landlords, who are the association's members, lack standing to sue in their own right. I thus conclude that the CBAA also lacks standing.

The tenant-plaintiffs claim that enforcement of the Pasco Ordinance will result in a non-consensual, government-compelled search of their apartments, in violation of their Fourth Amendment rights. The Ordinance, however, provides for no such remedy, *i.e.,* a compelled search. It does not provide for the issuance of an injunction compelling a landlord to make an inspection and obtain a Certificate. It simply provides that a business license will not issue without a Certificate. The only enforcement provision in the Ordinance is a civil penalty against a *landlord* who

rents without a license. Nothing in the Ordinance provides for any enforcement remedy directly against a tenant.

Presumably, a landlord can reserve in a lease his right of reasonable inspection of the premises. If he does, and the record is silent on this point, his right of inspection arises under the lease and not under the Ordinance. If he does not, he presumably would be in breach of the lease for any inspection made without a right to do so, and the tenant's remedy is against the landlord for breach of the lease's provision of quiet enjoyment and not against the City of Pasco.

*Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir.1994), and the other cases relied on by the majority in support of standing for the tenants, are not on point. Those cases hold only that a threat of injury can be sufficient to meet the actual injury requirement for standing, a proposition with which I have no quarrel. The majority does not fairly address, however, the required causal connection between the Ordinance and any injury to the tenants. Its only "analysis" of this point consists of the single, conclusory sentence: "The tenants' injuries are fairly traceable to the challenged action of the City—the enforcement of the Ordinance." Maj. op. at 797.

Although the Ordinance may be a cause in fact why a landlord would elect to exercise his right of reasonable inspection of the premises, it is not the Ordinance that gives him the legal right to do so. I do not understand either the landlord-plaintiffs or the tenant-plaintiffs to contend otherwise. To repeat, the Ordinance, does not purport to give a landlord any inspection rights, vis a vis his tenants. Such rights, if any there are, must flow from the lease, which governs the relationship between landlord and tenant, or provisions of state law other than the Ordinance. Thus, because any injury to the tenants will require the independent, intervening action of the landlords, exercising their legal rights under the lease or other provisions of state law, it cannot be said that the tenants' claimed injury is "fairly traceable to the challenged" ordinance for Article III standing purposes.[1] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

I conclude, therefore, that the tenant-plaintiffs as well lack Article III standing.

## II.

Assuming, however, that plaintiffs do not lack standing, the majority errs in its analysis of whether we should decline to reach the merits of this dispute under *Younger*[2] and *Pullman*[3] abstention.

Based on the fact that the Shaws are defendants in a state court civil action brought by the City of Pasco, the majority holds that *Younger* abstention applies. While paying lip service to *Green v. City of Tucson*, 255 F.3d 1086 (9th Cir.2001) (en banc), which held that "[a]s a threshold condition to the above three [*Younger* abstention] requirements, '*Younger* applies only when the relief the plaintiff seeks in federal court would "interfere" with the ongoing state judicial proceeding,'" maj. op. at 799 (quoting *Green*, 255 F.3d at 1098), the majority nonetheless proceeds to invoke *Younger* abstention even though no such "interference" is present in this case.

---

1. A landlord's inspection of the leased premises also would not constitute a Fourth Amendment search because no state action would be involved.

2. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

3. *R.R. Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

The majority tries vainly to trump up the "interference" by this case with the state court case:

> In this proceeding, the Shaws do more than simply "challeng[e] the constitutionality of a state statute." *Green*, 255 F.3d at 1098. They request that a federal court, inter alia, (1) declare that the license fees imposed by the Pasco Ordinance are illegal; (2) restrain the City from enforcing or collecting the fees imposed by the Pasco Ordinance; and (3) restrain the City from revoking their business license for failure to comply with the Pasco Ordinance. Thus, the relief the Shaws seek in federal court would interfere with the ongoing state judicial proceeding.

Maj. op. at 800. Of course, this is nothing more than an embellished restatement that the plaintiffs are challenging the constitutionality of the Pasco Ordinance—how else can one challenge the constitutionality of an ordinance, except by seeking to have it declared unconstitutional and to enjoin it? This action does not threaten a direct interference with ongoing state court proceedings; this is not what *Green* meant by "interference."

First, quoting the Court in *New Orleans Pub. Serv. Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (*"NOPSI"*), we recognized in *Green* that "the federal court's disposition of such a case may well affect, or for practical purposes preempt, a future-or, as in the present circumstances, *even a pending*-state court action. But there is no doctrine that the availability or *even the pendency* of state judicial proceedings excludes the federal courts." *Green*, 255 F.3d at 1096 (quoting *NOPSI*, 491 U.S. at 373, 109 S.Ct. 2506) (emphasis in the original). We then stated that "[i]n short, as the Court has often repeated, the 'mere potential for conflict in the results of

adjudications,' is not the kind of 'interference' that merits federal court abstention." *Id.* (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 816 & 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). We next noted that "[s]ince the possibility of duplicative litigation is a price of federalism, the prospect of such duplication, without more, does not constitute interference with state court proceedings justifying a federal court's dismissal of a case properly within its jurisdiction." *Id.* at 1098. Finally, we indicated what would constitute "interference"-a federal court action that "seek[s] to enjoin, declare invalid, or otherwise involve the federal courts in terminating or truncating the state court proceedings." *Id.*

Here, even as expansively restated by the majority, this federal litigation is, at most, parallel to and possibly duplicative of the state court litigation. It most emphatically does not constitute the kind of *direct interference* with the state court proceeding required by *Green* in order to invoke *Younger* abstention. I therefore disagree that *Younger* requires that we dismiss the Shaws' claims. On the contrary, *Green* requires that we do not.

It also bears on the case at bench that, in *Green*, we held that *Younger* abstention could not be invoked against plaintiffs in the federal action who were not parties in the pending state court action. *Id.* at 1099–1103. Here, none of the plaintiffs, except the Shaws, are parties to the state court proceeding; thus, *Younger* abstention is unavailable, as against them. The majority therefore proceeds to invoke *Pullman* abstention against the remaining plaintiffs. This invocation of *Pullman* abstention, however, is premised on the validity of *Younger* abstention against the Shaws. For if the Shaws are permitted to pursue their claims against the City of Pasco, as they should be under *Younger*

and *Green,* none of the benefits to be achieved by *Pullman* abstention against the remaining plaintiffs will materialize. *Pullman* abstention is an equitable doctrine to be invoked at the court's discretion. *See San Remo Hotel v. City & County of San Francisco,* 145 F.3d 1095, 1104 (9th Cir.1998). Because, as I have explained above, the Shaws should be permitted to remain in federal court actively to litigate their claims, equity and discretion counsel against invoking *Pullman* abstention as against the remaining plaintiffs.

In the circumstances of this case, the better course of action would be to accept the plaintiffs' suggestion to certify the doubtful questions of state law to the Washington Supreme Court, rather than to order *Pullman* abstention.

### III.

Because all of the plaintiffs lack Article III standing, I would remand the case with directions to dismiss the action. Were I to reach the merits of the dispute, I would order neither *Younger* nor *Pullman* abstention, but would certify the unresolved questions of state law to the Washington Supreme Court. For these reasons, I respectfully dissent.